# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00712-CV

**Dennis Davis, Individually and d/b/a Aqua Tech Marine Industries;
Debbie Desmond, Individually and d/b/a Aqua Tech Marine Industries;
and Aqua Tech Marine Industries, Inc., Appellants**

**v.**

**Steven L. Johnston, Maria Estella Arguinde-Johnston, Stephen H. Gay
and Carilynne Yaffe Gay, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. D-1-GN-06-00403, HONORABLE RHONDA HURLEY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This appeal arises from a dispute concerning the existence and scope of easements that were alleged to burden two waterfront lots on Lake Travis. One of the lots is owned by appellant Dennis Davis and the other by appellant Debbie Desmond. Davis and Desmond are jointly engaged in a business known as Aqua Tech Marine Industries, which had conducted its operations on the lots since 2004. Following a bench trial, the district court rendered judgment declaring that the Davis and Desmond lots are burdened by easements appurtenant permitting two married couples who each own residential lots in the area—the Johnstons and Gays, appellees—to traverse the Davis and Desmond lots to access the lake waters, attach boats and floating docks to the lots, and linger upon and use the lots for various recreational activities. The judgment further declared that the two waterfront lots are burdened by a "negative implied restrictive covenant" prohibiting commercial

use, in effect outlawing Aqua Tech's operations there. The district court subsequently made findings of fact and conclusions of law that the positive easement burdening the Davis and Desmond lots existed by virtue of express grant, estoppel, implication, and prescription.

Davis, Desmond, and Aqua Tech appealed, challenging primarily the legal and factual sufficiency of the evidence supporting each easement theory on which the district court relied. While we affirm, under a prescription theory, the district court's declaration that a positive easement burdens the properties, we will reverse its declaration that a "negative implied restrictive covenant" bars the lots' commercial use and remand the cause to the district court for further proceedings made necessary by these holdings.

## BACKGROUND

### Some geography

All of the properties at issue are located on the Graveyard Point peninsula on Lake Travis, not far from the present-day City of Lakeway. The geographic relationship of these properties and others described herein is best understood by referring to Appendix A, a 2003 map prepared by Travis Central Appraisal District that was in evidence at trial.

At relevant times, the Gays and Johnstons have owned adjacent groups of lots bordering Oak Hurst Road, whose path is depicted as an inverted "U" traversing the lower left corner of Appendix A. These lots are each situated below or to the south of Oak Hurst and a short distance to the right or east of the apex of the street's inverted "U."[1] Since 1999, the Gays have owned the three lots labeled in Appendix A with their names, one of .325 acres and the other two are

---

[1] A directional arrow is provided in the margin of Appendix A.

2

each roughly half that size. To the immediate lower right or southeast of the Gays' .325-acre lot is a lot labeled "Todd & Ann Kimbriel." Below or to the south of the "Kimbriel" lot are five lots of varying sizes and shapes, bordered to the right (east) by Oak Hurst, to the lower left (southwest) by Rabbit Run Circle, and to the bottom (south) by Max Drive. These five lots were all acquired by the Johnstons between 2001 and 2002. Subsequent to the date Appendix A was prepared, in 2006, the Johnstons purchased the "Kimbriel" lot as well.

The lots now owned by appellants Davis and Desmond are located along the eastern Lake Travis shoreline depicted in the lower center of Appendix A. In 2005, Davis would purchase the roughly 1-acre lot labeled "Annie Stewart Estate," which encompasses a portion of shoreline that bends to the west and then southeastward around a cove, then turns northward. In 2006, Desmond would acquire the .16-acre lot, labeled "Thelma Stewart," that is immediately adjacent to the Davis lot as the shoreline continues northward. With evident reference to the configuration of these properties' boundaries or the Lake Travis shoreline within them, the parties and witnesses have termed the Davis property "the Point" and Desmond's "the Notch," and we will do the same.

**Some history**

Some historical background concerning the ownership and development of these and other Graveyard Point properties is helpful in understanding and analyzing the issues on appeal. Most if not all of the land comprising the present-day Graveyard Point once was owned by the late Annie Stewart (the same person whose estate had owned the Point until Davis purchased it in 2005) and her late husband, A.K. The couple and other members of the Stewart family had farmed and ranched along the Colorado River for decades before the construction of the Marshall Ford dam

3

downstream formed Lake Travis—and created the peninsula now known as Graveyard Point—in the early 1940s. In fact, an old Stewart family cabin predating Lake Travis still stands on what is now a residential lot situated at the north or top side of the intersection of Chipmonk and Hurst View. That lot and cabin, coincidentally, were acquired by appellant Desmond in 1998, and the record reflects that she and appellant Davis resided there through time of trial.

In connection with Lake Travis's formation, large portions of the Stewarts' acreage were burdened with overflow easements in favor of the Lower Colorado River Authority (LCRA) up to, originally, the elevation contour of 670 feet above mean sea level (m.s.l.), and later up to 715 feet m.s.l. Although these changes greatly limited the Stewarts' agricultural use of their land (at least if one assumes the lake remains anywhere close to the 681 feet m.s.l. elevation at which it is considered "full"), they also had the salutary effect of transforming the Stewarts' remaining acreage into "lakefront" property suitable for residential or recreational development.

The couple began subdividing and selling residential lots on Graveyard Point in 1943. As lots were being developed, the Stewarts retained ownership of adjacent strips of land over which private roads were cut to provide access. The first lots conveyed by the Stewarts in 1943 and through mid-1944 were generally of precisely one acre in size, rectangular in shape, with long sides oriented perpendicularly to the eastern shore of Graveyard Point, and located between the paths of present-day Chipmonk and Oak Hurst as those roads continue southward and below the area depicted in Appendix A. The eastern or lakeside boundaries of these lots, as well as this portion of Chipmonk, corresponded roughly to the 715 m.s.l. contour that marked the upper limits of the LCRA's overflow easement. In these early conveyances, the Stewarts typically granted the lot owners an easement appurtenant permitting use of the "roadway now open on the East of the

4

land herein conveyed"—the road now known as Chipmonk. The Stewarts also typically granted an easement across the land they continued to own between the lot's eastern boundary and the 670 m.s.l. contour "for the purpose of ingress and egress from the tract of land herein conveyed to Lake Travis and to the property owned by the Lower Colorado River Authority."

In September 1944, the Stewarts conveyed title to four additional rectangular lots located between portions of present-day Chipmonk and Oak Hurst that are situated roughly north and northwest of the eventual site of appellees' lots, with long sides oriented roughly perpendicularly with the northern shore of Graveyard Point. Similar to the earlier conveyances, the Stewarts granted easements permitting lot owners use of "the roadway now open on the North" (the road now known as Chipmonk) and use of the Stewart-owned property lying to the north for "ingress and egress" to Lake Travis down to the 670 m.s.l. contour. During the decades ahead, disputes concerning the scope of these easements between successors to the Stewarts and the original grantees would spawn at least three appeals to this Court, including two we decided very recently. *See Harbor Ventures, Inc. v. Dalton*, No. 03–10–00690–CV, 2012 WL 1810205 (Tex. App.—Austin May 18, 2012, no pet. h.) (mem. op.); *Dee v. Crosswater Yacht Club, LP*, No. 03–10–00796–CV, 2012 WL 1810213 (Tex. App.—Austin May 18, 2012, no pet. h.) (mem. op.); *Schlapper v. Forest*, No. 03–06–00315–CV, 2010 WL 3370289 (Tex. App.—Austin Aug. 24, 2010, pet. denied) (mem. op.).

In early 1945, A.K. Stewart died, and Annie, on her own behalf and as executor of A.K.'s estate, continued developing the couple's Graveyard Point property. In April 1945, a surveyor named O.P. Schoolfield surveyed the subdivision of fourteen residential lots located farther to the peninsula's interior than those the Stewarts had previously conveyed. These included six lots

5

of roughly .325 acres each situated to the south of the road now known as Oak Hurst, near the apex of that road's inverted "U." Four of these six lots are in appellees' chains of title, and include the entirety of the property later acquired by the Gays and the northernmost two of the lots later acquired by the Johnstons.

The Schoolfield survey was certified in May 1945. On May 23, 1945, Annie conveyed two of the lots to predecessors in title of the Johnstons—the lot designated in Appendix A as the "Kimbriel" lot to Louis Dolan and Herbert Rehfield, and the lot immediately adjacent on the south to Fred and Margaret Sassman. A few days later, on May 29, Annie conveyed the lot on the opposite side of the Dolan lot—the lot that is now the larger, .325-acre owned by the Gays—to Aubrey and Estelle Frazer. During the following month, Annie conveyed the third lot to the west of the Frazer lot, which is not in appellees' chains of title, to Milas and Erna Dyer. Annie would not convey the remaining two lots situated between the Frazer lot and the Dyer lot until the following year. In April 1946, Annie conveyed the lot adjacent to the Dyer lot, which is not in appellees' chains of title, to Floyd and Myrtle Gibson. In May 1946, Annie conveyed the remaining lot, situated between the Gibson lot and the Frazer lot, to Leslie and Chester Ross, predecessors in title to the Gays. The grantees of the Ross lot or their successors would later subdivide it into the two smaller lots the Gays now own. To aid in distinguishing these and subsequent conveyances from Annie Stewart or her estate to appellees' predecessors in title, we will hereinafter identify each of the lots in appellees' chains of title by the name of its original grantee and have prepared a modified version of Appendix A, Appendix B, on which we have labeled each lot with the original grantee's name.

6

As is apparent from both Appendix A and B, the six lots to the south of present-day Oak Hurst that were subdivided by the 1945 Schoolfield survey, unlike those previously conveyed by the Stewarts, were partially land-locked by property that the Stewarts had already conveyed to third parties. In contrast to the Stewarts' prior easements granting "ingress and egress to Lake Travis" directly over intervening Stewart-owned land, Annie's 1945 deeds to the Sassman, Dolan, Frazer, and Dyer lots each granted an easement appurtenant permitting "ingress and egress to Lake Travis" via a "roadway now open." Specifically, in the deed to the Sassman lot later acquired by the Johnstons, Annie granted the following express easement:

> It is hereby agreed and understood that the roadway now open on the East of the land herein conveyed shall always be open and shall never be closed by any party, and grantee shall have the right to use this roadway for the purpose of ingress and egress to Lake Travis.

On the same day, Annie granted what the parties agree is a materially identical easement in her deed to the Dolan lot later acquired by the Johnstons.[2] Similarly, in her May 29, 1945 deed to the Frazer lot later acquired by the Gays, Annie granted an easement identical to that in the Sassman deed, except for the directional language:

> It is hereby agreed and understood that the roadway now open on the *Northeast* of the land herein conveyed shall always be open and shall never be closed by any party,

---

[2] The Dolan easement provided:

It is hereby agreed and understood that the roadway now open on the East of the land herein conveyed shall always be open and shall never be closed by any party, and grantees, their heirs and assigns, shall have the right to use this roadway for the purpose of ingress and egress to Lake Travis.

and grantees, their heirs and assigns, shall have the right to use this roadway for the purpose of ingress and egress to Lake Travis.

(Emphasis added.) And, in her Dyer deed the following month, Annie granted the same easement with a third variant in the directional language:

It is hereby agreed and understood that the roadway now open on the *North* of the land herein conveyed shall always be open and shall never be closed by any party, and grantees, their heirs and assigns, shall have the right to use this roadway for the purpose of ingress and egress to Lake Travis.

(Emphasis added.) However, in her subsequent deed to the Gibson lot in April 1946, as well as her May 1946 deed to the Ross lot in the Gays' chain of title, Annie did not grant any easement permitting use of roads or access to Lake Travis.

Between 1947 and 1950, Annie subdivided and conveyed the next three lots along present-day Oak Hurst that lie to the south of the Sassman lot, all of which were later acquired by the Johnstons—identified in Appendix B, with reference to the names of the original grantees, as the "Menn," "Offutt No. 1," and "McClanahan" lots. In each of these deeds, Annie granted an easement appurtenant permitting use of "the roadway now open on the East of the land herein conveyed" or "the roadway situated East of this land herein conveyed," but did not explicitly state that these easements were for the purposes of providing access to Lake Travis.

Meanwhile, Annie also conveyed substantial portions of her property among her and A.K.'s seven children. These included eight lots on the north and east side of present-day Oak Hurst that, along with the six lots previously discussed, had been subdivided by the 1945 Schoolfield survey. The Stewart family cabin was encompassed within one of these lots, which Annie conveyed

8

by gift deed to her son, Arthur, reserving a life estate for herself. As it appears in the Schoolfield survey and was conveyed to Arthur, the boundaries of this lot encompassed not only the entirety of the present-day lot containing the cabin that was later acquired by Desmond, but also the path of present-day Hurst View that now runs adjacent to the Desmond lot and a portion of the present-day lot on the opposite side of Hurst View. Later, in 1949, Annie conveyed to each of her children, via gift deed, his or her own tract of roughly two acres of relatively low-lying land along the northern and eastern shoreline of Graveyard Point. The seven tracts encompassed an area extending from the peninsula's northern tip to immediately north of, but not including, the areas that later became known as the Point and Notch. During the ensuing decades, some of the children, but not all, would subdivide their respective tracts into smaller residential lots. Moreover, Emmet Stewart, to whom Annie had gifted the tract immediately north of the Point and Notch area, would operate a marina and rental cabins on his property beginning by at least the 1960s. The business remained in operation until a July 1970 tornado destroyed it.

Annie and A.K.'s development of their Graveyard Point property brought physical changes to the peninsula, including new roads, that were reflected in aerial photographs in evidence at trial. In the earliest photograph, dated 1940, the Stewart family cabin is visible, as is a road running northward from that area along roughly the path of present-day Blue Cat. Another road is also seen, running roughly north-south across what is now the western portion of the Graveyard Point peninsula. As demonstrated by other evidence, this latter road was Hurst Creek Road, a public road predating the construction of Mansfield Dam. Hurst Creek Road originally continued northward past what became the peninsula's northern shore into areas that were later inundated by Lake Travis. Also discernable in the 1940 photograph is a portion of the path of the road now known

9

as Chipmonk, running from its intersection with Hurst Creek Road eastward to the cabin area. But by the date of the next oldest aerial photograph, dated 1951, a number of additional roads are discernable, including the continuations of Chipmonk southward from the cabin site and the roads now known as Oak Hurst and Hurst View.

A road is also visible running eastward from the general area in which the Hurst View and Chipmonk routes intersected. This road continues into the vicinity of the Point's northern boundary before curving northeastward following a route roughly parallel to the shoreline. Also visible in the photograph is a circular road or path, which we will term the "lake access loop," that branches southward off from the aforementioned road just before it makes its northeastward curve. The loop descends into the area of the Point property, eventually running along the shoreline on the eastern side toward the shore at the property's southeastern corner, then following the shoreline's westward bend for a short distance before looping upward to intersect the other road again. As confirmed by other evidence, including the testimony Mary Stewart Hicks, a granddaughter of A.K. and Annie Stewart, the photograph demonstrated the existence of (1) a caliche or dirt road that ran into and across the northern area of the Point before curving northward onto Emmet Stewart's adjacent tract, and (2) another unpaved road—the lake-access loop—that reaches the Point's shore.

In 1952, Annie Stewart died, leaving the undeveloped portions of the Graveyard Point property, including the Point and Notch area, to her children. Her estate, through son Arthur as executor, continued subdividing and selling residential lots from the remaining property. In 1961, Arthur and the other heirs filed a plat for an "Annie Stewart Subdivision" encompassing most of the remaining undeveloped land still owned by Annie's estate. The plat depicted both the property being newly subdivided, which was identified as numbered lots, and several of the lots previously

10

conveyed, including those previously conveyed to appellees' predecessors, which were not numbered but instead labeled with the names of their then-current owners. The plat did not depict or include the Point and Notch area. The dedication "adopt[ed] the numbered tracts shown hereon, which are part of the Annie Stewart Estate not heretofore disposed of, as a subdivision of such property . . . and d[id] hereby grant a private easement over the roads, shown hereon, for use of the present and future owners of the tracts abutting such roads, their heirs and assigns," reserving fee title in the roads to the Annie Stewart estate. Soon thereafter, the subdivision lots were distributed among the heirs. Contained in each of these deeds was the grant of an express easement "permitting ingress and egress over existing roadways to the waters of Lake Travis."

In 1962, the estate conveyed the tract that became known as the Notch—.16 acres of the northernmost shoreline of what had previously been a single tract also encompassing the Point—to Emmet Stewart, who was operating the marina on his adjacent tract to the north around this time. This deed, similar to the deeds to the new Annie Stewart subdivision lots, contained an express easement stating that "the grantee . . . his heirs and assigns, are hereby granted the privilege of the use of the existing roadways leading to and from this property and to Lake Travis." There was evidence that the only road leading toward the Notch was the caliche or dirt road across the northern portion of the Point, although the road curved northeastward before reaching the Notch itself, and that the lake-access loop over the Point ran alongside and near the Notch's western boundary before reaching the shoreline south of the Notch.

In 1965, the estate also conveyed, from land that had not been part of the Annie Stewart Subdivision, the two remaining lots in the Johnstons' chain of title ("Offutt Nos. 2 and 3") to Douglas Offutt, the original grantee of the Johnstons' Offutt No. 1 lot in 1949, and who

11

in the meantime had also acquired the Sassman, Menn, and McClanahan lots in the Johnstons' chain of title. Similar to the dedication in the subdivision plat and the express easement in the estate's deed of the Notch to Emmet Stewart, the deed to the Offutt Nos. 2 and 3 lots granted an express easement appurtenant providing "the right of ingress and egress to and from said property and to and from the waters of Lake Travis over the existing roadways."

A 1964 aerial photograph of Graveyard Point—the next oldest in evidence after the 1951 photo—reflects the continued existence of the roads visible in the 1951 photo, as well as the lake-access loop over the Point. The same is true of aerial photographs from 1973, 1980, 1988, and 1995.

**Use of the Point and Notch 1940s-1990s**

Although Annie Stewart and later her estate had sold much of her and A.K.'s Graveyard Point property by the mid-1960s, still remaining under her estate's ownership at the time, and for several decades thereafter, was the Point, as well as some narrow strips of low-lying lakeside property that were burdened by the direct lake-access easements that Annie and A.K. had granted in their early conveyances. According to Mary Stewart Hicks, members of the Stewart extended family had used the Point and Notch area for lake access and recreation "probably from the time I was a baby" in the early 1940s.[3] Hicks elaborated that the family used the property as "our access to the water" and for picnicking, fishing, and "just walking down there and looking around, whatever." She described the frequency of the family's use of the property as "20 years definitely we used it. After that, off an[d] on."

---

[3] Hicks indicated that she was born around 1940.

There was also evidence that during the years in which the Emmet Stewart marina was operating, the Point and Notch served as a parking area for patrons. But following the marina's demise, according to a longtime Graveyard Point resident, Theodore Staub, the Point and Notch area became overgrown and had come to resemble a "community dump" by the 2000s.

Whatever the property's aesthetic appeal might have been, there was evidence that beginning in the early 1950s, and continuing for decades thereafter, some third parties who owned property on Graveyard Point, including some of appellants' predecessors in title, used the Point and Notch as their primary access route to Lake Travis. These individuals would drive or walk from their lots on the road now known as Oak Hurst eastward over the road now known as Hurst View, continue a short distance southward on the road now known as Chipmonk to reach a road that ran eastward toward the Point, later known as Hurst Creek Circle. The route of Hurst Creek Circle, in turn, eventually continued into the previously described caliche or dirt road that ran across the northern portion of the Point. Once at the Point, the evidence reflected that these individuals would park on the Point or Notch, traverse these properties via the lake-access loop or otherwise to reach the lake waters, picnic or engage in other recreational activities on the shoreline, and even maintain boats and boat docks there. In addition to witness accounts, evidence of such historical uses included several sets of family photographs depicting property owners and their guests boating, swimming, and engaging in other recreational activities at the Point or Notch, or on or around boat docks offshore. Likewise, the aerial photographs from 1964, 1973, 1980, 1988, and 1995 each show one or more boat docks moored off of the Point or Notch.

Appellants ultimately stipulated to several facts regarding the manner in which appellees' predecessors accessed and used the Point and Notch:

13

- "[Appellees'] predecessors in title, Offutt [a predecessor to the Johnstons, as previously indicated] and Peterson [as explained below, the immediate predecessor to the Gays] used Hurst View and [appellants'] properties and maintained boat docks and boats at [appellants'] properties during the time they owned [appellees'] tracts."

- "Mr. Peterson used Hurst View and [appellants'] properties to access Lake Travis and maintained a boat dock and boat at the properties [appellants] consider the Point from at least 1991 through 1999 when he sold the property to the Gays."

- "Mr. Offutt used Hurst View and [appellants'] properties to access Lake Travis and maintained a boat dock and boat at the properties [appellants] consider the Point from at least 1958 through 1985."

- "The Rogers [who would later acquire the Sassman, Offutt No. 1, and Menn lots from an Offutt heir following Offutt's death, and who would convey the lots to the Johnstons in June 2001] used Hurst View and [appellants'] properties to access Lake Travis during the time they owned the Johnstons' tracts."

While acknowledging that these third-party uses of the Point and Notch area dated back to at least the 1950s, Mary Stewart Hicks insisted that they began with a grant of permission from her uncle Arthur Stewart, the executor of Annie Stewart's estate. She indicated that, in fact, the lake-access loop or a portion of it had been construed thereafter by "the people that used our property," an endeavor that, she added, had entailed moving large rocks and clearing holes in a line of trees. However, when confronted with the 1951 aerial photograph during cross-examination, Hicks acknowledged that the entire lake-access loop was already visible by that time—a time at which Annie was still alive and still owned the Point and Notch.

**Appellees use the Point and Notch, too**

Beginning as early as the mid-1980s through the following decade, the Gays, although not yet themselves owners of Graveyard Point realty, had maintained a boat and smaller children's watercraft as guests on a floating dock owned by Tim Arnold, who owned a residential lot on

14

Hurst View. Arnold, according to Stephen Gay, kept his dock attached to the Point or Notch, and Stephen estimated that three or four other dock owners did the same during this period. In evidence were several photographs of the Gays and their children sailing, swimming, and enjoying other recreational activities on the dock and in the waters nearby.

In 1999, the Gays purchased their three lots on Oak Hurst from the Bob Peterson family, who had owned them since the early 1990s. With the realty—which included what Stephen Gay described as a "little cubby 1950s fishing cabin"—the Petersons also conveyed a boat dock and boat that they had originally acquired from their lots' prior owner. According to Stephen Gay, this boat dock had been moored at the Point and Notch for as long as he had been visiting there.

The Johnstons purchased the Sassman, Offutt No. 1, and Menn lots from the Rosses in June 2001. According to Steven Johnston, his family had owned a motorboat, enjoyed skiing and other recreational activities on the water, and had deliberately sought out residential property with access to Lake Travis. Initially, however, the Johnstons did not own or maintain a boat dock at the Point or Notch, nor is there any indication that the Rosses did during the years they owned the lots.

Following their respective purchases of lots on Oak Hurst, there is no dispute that both the Gays and Johnstons, like their predecessors, traveled over Hurst View, Chipmonk, and Hurst Creek Circle to the Point, walked or drove over the lake-access loop, parked on and traversed the Point or Notch, and engaged in recreational use of the properties. These uses included the Gays' continued use of the boat dock they had acquired from the Petersons, along with watercraft they kept there.

15

However, in September 2001, an attorney acting on behalf of the Stewart heirs contacted both the Gays and Johnstons demanding that they remove any boats and docks from the Point and Notch and requesting proof of any rights they had to use the properties. A fence with a gate and "No Trespassing" sign was erected blocking the road to the Point. In response, the Gays and Johnstons each provided the heirs' attorney copies of express easements in their respective chains of title, expressing the view that these instruments granted them the right to access and use the property as they previously had. The fence was removed, and appellees heard no more on the matter from the heirs or their attorney for several months. Professing the belief that the absence of a response confirmed the validity of their easement claim, in early 2002 the Johnstons purchased a boat dock as well as a fishing boat, and moored the dock with their boats at the Point. Subsequently, in May 2002, the Johnstons acquired the McClanahan lot from Michael and Tracy Good, who had acquired it from heirs of Douglas Offutt. Similarly, the Gays claimed that some of the Stewart heirs had assured them that the Gays could continue crossing the property and using their dock and boats, and explained that their family was merely seeking to restrict access to their property by persons unauthorized to be there.

However, during the latter half of 2002, the Stewart heirs' attorney left notices on the Gays' and Johnstons' docks ordering that the docks and boats be removed. Again, the couples provided the attorney copies of their deeds and heard nothing further thereafter from the heirs or their attorney. Thereafter, the Gays and Johnstons continued accessing and using the Point and Notch as before. Furthermore, the Gays would also purchase a new boat and dock thereafter, and the Johnstons would purchase additional lots—the Offutt Nos. 2 and 3 lots in 2001 and 2002 and, in 2006, the Dolan lot from the Kimbriels.

16

**Appellants come to the neighborhood**

Meanwhile, in 1997, appellee Desmond had purchased acreage on the northern tip of Graveyard Point that had been part of one of the tracts that Annie Stewart had gifted to her children in 1949. The original grantee of this tract, son Ernest Stewart, had subsequently subdivided the tract's interior into residential lots while retaining the portion of the tract lying between those lots and the lake. Somewhat similar to his parents' earliest conveyances on Graveyard Point, Ernest granted the lot purchasers express easements allowing ingress and egress to the lake over his intervening property down to the 670 m.s.l. contour. The property that Desmond acquired in 1997 included one of the residential lots and, subject to the aforementioned easements, Ernest's former shoreline property.

Desmond and Davis began conducting Aqua Tech's business operations at the site, constructing boat docks. This prompted owners of the neighboring residential lots to initiate what the parties have termed the "*Mabry*" litigation against Desmond, Davis, and Aqua Tech (i.e., the same parties who are now appellants here).[4] The *Mabry* plaintiffs sought declaratory and injunctive relief to restrain alleged interference with their express easement rights and to enforce an express restrictive covenant barring commercial use of Desmond's residential lot. Additionally, although no express restrictive covenant barred commercial use of the shoreline property, the plaintiffs asserted that this property was nonetheless subject to a negative implied restrictive covenant barring such use. Following a bench trial, the district court rendered judgment in favor of the plaintiffs and, in part, barred appellants from using either the residential lot or shoreline property for commercial

---

[4] Over appellants' objection, a copy of the *Mabry* judgment and findings of fact and conclusions of law were admitted into evidence below.

17

use. Appellants filed a notice of appeal from the *Mabry* judgment, but this Court would ultimately dismiss their appeal for want of prosecution in January 2005.[5]

Instead, appellants responded to the *Mabry* judgment chiefly by attempting to relocate Aqua Tech's operations to a different location on Graveyard Point where there were no legal restrictions against them. It happened that around the same time, the Annie Stewart heirs, through Mary Stewart Hicks, were attempting to sell the Point and some narrow strips of property near the 670 m.s.l. contour that ran along the peninsula's shore to the south. Although A.K., Annie, or her estate had typically imposed express restrictive covenants on the residential lots they had developed on Graveyard Point, no such restrictions had ever been applied to the Point. (The same was also true of the Notch). In 2004, Davis began leasing the Point property from the Stewart heirs through Hicks. In January 2005—and on the same date on which appellants' appeal in *Mabry* was dismissed—Davis purchased the Point from the heirs, with the lakeside strips of property thrown in, via a deed without warranties. The deed did not contain any express provision barring commercial use of the property.

Prior to the conveyance, a survey of the property was prepared by a George Sanders, who would later testify on appellants' behalf at trial. A copy of relevant portions of Sanders's survey appears in Appendix C, which was admitted into evidence at trial. The survey reflected the ongoing existence of the road through the northern portion of the Point—in the form of an "asphalt drive" that extended from Hurst Creek Circle eastward from that street's intersection with Graveyard Point

---

[5] *See Debbie Desmond, Dennis Davis, Individually and d/b/a Aqua Tech Marine; and Aqua Tech Marine Indus., Inc. v. Wanda Mabry, Roy Mabry, Marquette Mabry, and Mary Sue Wheeler*, No. 03–04–00316–CV, slip op. ¶ 1 (Tex. App.—Austin Jan. 28, 2005, pet. denied) (mem. op.), *available at* http://www.3rdcoa.courts.state.tx.us/opinions/pdfOpinion.asp?OpinionID=13451.

18

Road, then became a "dirt drive" before curving northeastward onto the adjacent property—and a "dirt path" corresponding roughly to the route of the lake-access loop.

**The dispute**

Although there was evidence that Davis and appellees initially attempted to be somewhat accommodating to one another—for example, appellees acceded to a request from Davis that they relocate their docks along the Point shoreline to make room for Aqua Tech's operations—Davis ultimately began requesting, and later demanding, that appellees pay him rentals if they wished to use his property. By late 2005, matters escalated to the point that appellees accused Davis and Desmond of threatening behavior, of making petty or vexatious complaints to authorities, and of twice cutting cables attaching their boats and docks to the land and allowing them to float dangerously around Lake Travis.

On February 2, 2006, appellees sued appellants seeking declaratory, injunctive, and monetary relief predicated on allegations that appellees each owned easements permitting them to access and use the Point for recreation, including maintaining docks and boats there, and that a negative implied restrictive covenant barred commercial activity on the property.[6] Insisting that appellees had no rights in the property and that there were no applicable restrictions against commercial use, appellants countered with their own claims for declaratory, injunctive, and monetary relief to remedy alleged slander of title, trespass, and nuisance, and to quiet title. Appellees obtained a temporary restraining order prohibiting Davis and Desmond from damaging or interfering with the

_____

[6] To be precise, only the Johnstons and Steven Gay were originally plaintiffs, but Carilynne Gay joined in these claims after appellees named her as a defendant to their claims, along with the three original plaintiffs.

Gays' and Johnstons' personal property or ability to access the roadway on the Point, although the court denied appellees' request to enjoin commercial use of the properties.

Later that year, while the lawsuit was still pending, Desmond acquired the Notch property. The district court would later find that Desmond, ostensibly under color of a claim that she was not bound by the TRO because she owned a property other than the Point, continued efforts to obstruct appellees' access and use of the properties.

The parties' claims were tried to the bench, which heard evidence over the course of four days. Following trial, the district court rendered judgment declaring that appellees owned easements appurtenant to each of their lots granting them "[t]he right to unobstructed use of the roadway connecting Oak Hurst Road with the Davis Parcel" (i.e., proceeding over Hurst View, down Chipmonk to Hurst Creek Circle, and eastward over Hurst Creek Circle to the entrance to the Point) "by foot, bicycle, and/or by vehicle," as well as the following easements granting the right to use the Point and Notch themselves:

> Roadway on the Davis Tract:
> The right to the unobstructed use of The Roadway on the Davis Tract [defined to include both the road over the northern portion of the Point, as well as a route tracking the lake access loop] for the purposes of ingress and egress to and from the waters of Lake Travis and its shore areas, including the right of passage over, upon, and across such roadway by foot, bicycle, and by vehicle. The right to use The Roadway on the Davis Tract includes the right to remove obstructions, including trimming overhanging branches of trees. It also includes the right, but not the obligation, to repair, pave, grade, or maintain the roadway, or generally to perform any act necessary to render The Roadway on the Davis Tract suitable for passage. It includes the right to place and to maintain survey markers showing the location and limits of The Roadway on the Davis Tract.

<u>From Roadway to Waters of Lake Travis:</u>
The right of unobstructed passage over, upon, and across the Davis Tract and/or the Desmond Tract by foot, bicycle, or by vehicle from The Roadway on the Davis Tract to the waters of Lake Travis, at whatever level they may be.

<u>Boat Docks:</u>
The right to maintain and use a boat dock, its anchors, cables, associated walkways, and other appurtenances, and boats, and/or other recreational floatation devices, on or over those portions of the Davis Tract and/or the Desmond Tract subject to inundation by the waters of Lake Travis, whether floating or resting on the Shore of Lake Travis.

<u>Recreation:</u>
The right to linger within and to use for all recreational purposes those portions of the Davis Tract and the Desmond Tract (a) lying within the Roadway on the Davis Tract, (b) lying within the Shore of Lake Travis, or (c) inundated by the waters of Lake Travis.

The district court also declared that a "negative implied restrictive covenant" prohibited use of the Point or Notch for commercial purposes.

In addition to the foregoing declaratory relief, the judgment also permanently enjoined Davis and Desmond "from ever doing any and all of the following":

1.    Taking any action that interferes with or obstructs Plaintiffs from using their easement rights as declared herein.

2.    Operating any commercial enterprise whatsoever at the Davis Tract or the Desmond Tract.

3.    Taking any action that obstructs and/or interferes with Plaintiffs' or Plaintiffs' invitees' recreational use and enjoyment of Lake Travis or restricts their engaging in reasonable recreational uses of the Roadway on the Davis Tract, the Davis Tract or the Desmond Tract.

4    Blocking or obstructing in any way Plaintiffs' or Plaintiffs' invitees' vehicular and/or pedestrian access to the Roadway on the Davis Tract and/or the Desmond Tract, Hurst View Road and/or the Roadway to the Davis Parcel as defined above.

5.    Altering the land at the Davis Tract or the Desmond Tract in any way that is inconsistent with Plaintiffs' easement rights.

6.    Altering the location of the Roadway on the Davis Tract unless by written agreement of Plaintiffs and Defendants.

7.    Taking any action that creates a hazard on the Davis Tract or the Desmond Tract[.]

8    Taking any action that creates a hazard in the waters surrounding Plaintiffs' boat docks, boats, and/or other floatation devices.

9.    Touching or doing any damage to Plaintiffs' boat docks, boats, anchors, and/or other personal property or directing others to do so.

10.   Taking any action that threatens or harasses Plaintiffs or their invitees.

Finally, the district court rendered judgment that appellants should take nothing on their counterclaims and awarded attorney's fees to appellees as permitted by the Uniform Declaratory Judgments Act.[7]

The district court subsequently made findings of fact and conclusions of law. Among other holdings, the court concluded that appellees' positive easement permitting use of the Point and Notch existed by express grant in appellees' deeds, as well as theories of estoppel, implication, and prescription.

This appeal ensued.

**ANALYSIS**

Appellants bring seven issues on appeal. The first five challenge the district court's judgment declaring that appellees own the above-described positive easements to use the Point and

---

[7] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001–.011 (West 2008).

Notch for recreational purposes. Specifically, in their first issue, appellants challenge the legal and factual sufficiency of the evidence underlying the district court's legal conclusions that appellees hold express easements that burden the Point or Notch. In their second issue, appellants urge that the district court erred in holding that the express easements in appellees respective chains of title, which purport to grant no more than a right of "ingress and egress" to and from Lake Travis, confer the rights to maintain boats and boat docks and engage in the other recreational uses it declared in the judgment. In their third, fourth, and fifth issues, appellants challenge the legal and factual sufficiency of the evidence underlying the district court's legal conclusions that the positive easements existed under theories of, respectively, estoppel, implication, or prescription.

In their sixth issue, appellants attack the district court's judgment that a "negative implied restrictive covenant" bars commercial use of the Point and Notch. Finally, in their seventh issue, appellants urge that to the extent we sustain their other issues, we should reverse the district court's judgment, render judgment for them on their declaratory-judgment counterclaims, and remand their accompanying counterclaim for attorney's fees for reconsideration in light of the change in prevailing parties.

**Standard of review**

Each of the appellants' issues on appeal turns at least in part on whether the evidence is legally or factually sufficient to support the district court's judgment. In an appeal from a judgment rendered after a bench trial, the trial court's findings of fact serve the same function as the verdict of a jury. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When a party is challenging the legal sufficiency of the evidence supporting an adverse finding on an issue on which

23

an opposing party has the burden of proof, it prevails if the record shows any one of the following: (1) there is no evidence supporting a vital fact, (2) the evidence offered to prove a vital fact is no more than a mere scintilla, (3) the evidence conclusively establishes the opposite of the vital fact, or (4) the court is barred by law or the rules of evidence from considering the only evidence offered to prove the vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex. 1995). Conversely, evidence conclusively establishes a vital fact when the evidence is such that reasonable people could not disagree in their conclusions. *See City of Keller*, 168 S.W.3d at 814–17.

When addressing a legal-sufficiency challenge, we are to view the evidence in the light most favorable to the district court's findings, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 807. Moreover, we must indulge every reasonable inference that would support the district court's findings. *Id.* at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

When a party challenges the factual sufficiency of the evidence supporting an adverse finding on which the opposing party had the burden of proof, we should set aside the finding only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *See*

24

*Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the finding should be set aside. *See Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

**Express grant?**

In support of its judgment declaring that appellees owned the aforesaid positive easements permitting their recreational use of the Point and Notch, the district court made legal conclusions that Annie Stewart, or her estate, had expressly granted those very easements when initially conveying every one of appellees' lots to its original grantee. Underlying these conclusions, however, were somewhat narrower findings (or, in substance, conclusions) that centered primarily on the meaning and application of the specific easement language Annie used in her May 1945 deeds to the Gays' Frazer lot and the Johnstons' Sassman and Dolan lots. In these deeds, as previously noted, Annie had granted an easement appurtenant permitting use of "the roadway now open on the Northeast of the land herein conveyed" (in the Frazer deed) and "the roadway now open on the East of the land herein conveyed" (in the Sassman and Dolan deeds) "for the purpose of ingress and egress to Lake Travis." With evident reference to this language, the district court found or concluded that "[a]t the time of the conveyances, the roadway now open to the East of the Sassman Parcel, the Dolan Parcel . . . and Northeast of the Frazer Parcel providing ingress and egress to the public waters of Lake Travis is the roadway now known collectively as Hurst View, the roadway to the Point (the

25

Davis tract) and the roadway on the Point."[8]  In other words, the district court held that "the roadway now open" contemplated by these 1945 express easements corresponded precisely to the route of the easement declared in the district court's judgment.  Rejecting alternative theories advanced by appellants at trial, the district court further found or concluded that "[t]he roadway located East of the Johnston Tracts and Northeast of the Gay Tracts" was not any of the roadways later named Oak Hurst, Hurst Creek Road, Blue Cat Lane, or Chipmonk Road.  The district court also made findings tracking the language of the easement in the 1965 deed to the Offutt Nos. 2 and 3 lots now owned by the Johnstons.

As for the scope of appellees' easements, the district court found or concluded that the easements were "unqualified" and permitted not only "ingress and egress to the waters of Lake Travis," but also the "recreational activities in the waters of Lake Travis and on the Shore of Lake Travis, as the Court declared in its Final Judgment."

In their first issue, appellants assert that the district court made two chief errors in finding or concluding that these express easements burdened the Point and Notch.  First, appellants

_____

[8] This finding or conclusion also referenced the Menn, Offutt No. 1, and McClanahan deeds in the Johnstons' chains of title, but this appears predicated on erroneous findings that the language of these easements tracked the easement in the Sassman deed.  As previously explained, those three deeds, unlike the Sassman and Dolan deeds, did not purport to grant any right of access to Lake Travis.  The substance of the court's finding or conclusion thus corresponds more precisely to the language of the Sassman and perhaps the Dolan deed, and the Johnstons have primarily emphasized the Sassman deed on appeal.

Similarly, although the district court's legal conclusions state that the Gays have express easements in the chains of title to all three of their properties, it made no underlying findings that Annie granted such an easement in the Ross deed, and the evidence conclusively negates such an assertion.  As previously noted, Annie did not grant any easement in the Ross deed or, for that matter, in the Gibson deed she executed around the same time in 1946.  Consequently, as the Gays seem to acknowledge, they must rely solely on the express easement contained in the Frazer deed.

26

urge that the district court misconstrued or ignored the easements' directional language. They insist that the unambiguous language, applied to conclusive evidence of the geographic relationship between the relevant lots and roads, compels the conclusion that the road now known as Oak Hurst, not the easement route declared by the district court, was the sole "roadway now open on the Northeast" of the Frazer lot and "on the East" of the Sassman and Dolan lots. Second, appellants maintain that the court's construction was not viable in any event because the evidence was legally and factually insufficient to establish that the first portion of the "roadway" and easement route it declared—the road now known as Hurst View—was "now open" as of the dates of the relevant conveyances. In their second issue, appellants urge that even if the district court correctly determined the easements' location, it misconstrued the scope of uses authorized in the instruments and awarded appellees rights far exceeding "ingress and egress to Lake Travis."

An easement is a nonpossessory interest in land that authorizes its holder to use the property for specified purposes only. *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002) (citing *Restatement (Third) of Property (Servitudes)* § 1.2 cmt. d (2000)). Nothing passes by implication "except what is reasonably necessary" to fairly enjoy the rights expressly granted. *Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex. 1974). Use of the easement to pursue a purpose not provided for in the grant is not permitted. *Marcus Cable*, 90 S.W.3d at 701; *Coleman*, 514 S.W.2d at 903.

An easement's express terms, interpreted according to their generally accepted meaning, delineate the purposes for which the easement holder may use the property. *Marcus Cable*, 90 S.W.3d at 701 (citing *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 103 (Tex. 1999)). We apply basic principles of contract construction and interpretation. *See DeWitt*, 1 S.W.3d at 100.

27

Construction of an unambiguous contract presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006); *City of El Paso v. Public Util. Comm'n*, 344 S.W.3d 609, 619 (Tex. App.—Austin 2011, no pet.). Under these principles, our primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Ordinarily this is a function of the text the parties have chosen because it is the objective, not subjective, intent that controls. *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam); *see Harbor Ventures, Inc.*, 2012 WL 1810205, at *17. When the easement's terms are not specifically defined, they are given their plain, ordinary, and generally accepted meaning. *See Marcus Cable*, 90 S.W.3d at 702; *see also Restatement (Third) of Property (Servitudes)* § 4.1 cmt. d ("[Easement] language should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved. Searching for a particular meaning adopted by the creating parties is generally inappropriate because the creating parties intended to bind and benefit successors for whom the written record will provide the primary evidence of the servitude's meaning."). Adhering to an easement's express terms serves important public policies by promoting certainty in land transactions and allowing potential purchasers to safely rely upon granting language. *Marcus Cable*, 90 S.W.3d at 702. "Similarly, those who grant easements should be assured that their conveyances will not be construed to undermine private-property rights—like the rights to 'exclude others' or to 'obtain a profit'—any more than what was intended in the grant." *Id.*; *see id.* at 700 ("A property owner's right to exclude others from his or her property is recognized as 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" (quoting *Dolan*

28

*v. City of Tigard*, 512 U.S. 374, 384 (1994) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979))).

As with contract construction generally, evidence of the context and circumstances surrounding the execution of an express easement may in some instances be relevant in determining the meaning of the words the parties have chosen. *See Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (noting that, subject to parol evidence rule, court may consider surrounding circumstances that inform the meaning of contract text); *Marcus Cable*, 90 S.W.3d at 701 (acknowledging that "the circumstances surrounding the creation of the servitude" may inform the easement's meaning) (quoting *Restatement (Third) of Property (Servitudes)* § 4.1; *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *see also Harbor Ventures*, 2012 WL 1810205, at *8 ("We construe contracts from a utilitarian standpoint, bearing in mind the particular activity sought to be served.") (citing *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005)). But only if the words the parties used, considered in context, are susceptible to more than one reasonable construction—i.e., ambiguous—may we look to extrinsic evidence of the parties' subjective intent. *See City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968) ("It is the general rule of the law of contracts that where an unambiguous writing has been entered into between the parties, the Courts will give effect to the intention of the parties as expressed or as is apparent in the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls."); *see also J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (noting that if court can give contract definite or certain legal meaning, it is unambiguous and court must construe it as a matter

of law). The threshold question of whether an easement is ambiguous or not, as with questions of contract construction generally, is a question of law. *See City of El Paso*, 344 S.W.3d at 619 (citing *J.M. Davidson*, 128 S.W.3d at 229).

### *Scope of easements*

We begin with appellants' second issue, concerning the scope of the express easements at issue, because our resolution of it is both straightforward and ultimately helpful in informing our analysis of appellants' first issue. To the extent any of the easements appellees own purports to grant any right of access to Lake Travis, they explicitly afford only a right to "ingress and egress." It happens that this Court very recently had occasion to construe a materially identical easement in one of A.K. and Annie Stewart's 1944 deeds to lots on the north side of present-day Oak Hurst. *See Harbor Ventures*, 2012 WL 1810205, at *1. In *Harbor Ventures*, we held that "ingress and egress . . . to Lake Travis" unambiguously denotes only those activities reasonably necessary to come and go to the stated destination, and did not confer rights to install boat docks or engage in other broader "recreational purposes." *Id.* at *11. In so doing, we relied on an established line of precedents—including several of our own—for the proposition that rights of "ingress and egress" do not "impliedly grant the right to use the property for general recreational purposes 'normally associated with the use and enjoyment of lakefront property.'" *See id.* (citing *Coleman*, 514 S.W.2d at 903 (easement for "ingress and egress" does not grant "right to linger for recreational purposes, or to exercise waterfront privileges"); *Cummins v. Travis Cnty. Water Control & Improvement Dist. No. 17*, 175 S.W.3d 34, 52 (Tex. App.—Austin 2005, pet. denied) (mooring boat dock on land over which one has easement for purposes of ingress and egress to lake not reasonably

necessary to achieve rights expressly granted); *Lakeside Launches, Inc. v. Austin Yacht Club, Inc.*, 750 S.W.2d 868, 869 (Tex. App.—Austin 1988, writ denied) (easement for purpose of ingress and egress does not convey right to anchor and float commercial boat dock); *Wall v. Lower Colo. River Auth.*, 536 S.W.2d 688, 691 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.) (right of ingress and egress across land retained by grantor does not grant implied right to build or maintain structures appropriate to lakefront property)).

Relying on this same line of authority, we sustain appellants' second issue. We hold that the express easements granted in appellees' chains of title, wherever they might be located and whatever property they burden, afford appellees only the right to engage in activities reasonably necessary to serve the purpose of coming and going to and from Lake Travis—not, as the district court held, the right to maintain boats or docks, or engage in the array of other recreational activities it identified.

### Location of the Gays' easement

We now turn to the district court's findings and conclusions concerning whether appellees' ingress-egress easements burden the Point and Notch. It is helpful to consider the easements in the Gays' versus the Johnstons' chains of title separately.

Under the unambiguous text of the easement granted in the Frazer deed, each of the following must be true of the easement's location or route:

- The route must have been "open" as of May 29, 1945, the date of the Frazer deed.

- As of that date, the route must have been a singular "roadway" within the meaning of the easement. As appellees have emphasized throughout this litigation, the phrase "*the* roadway

31

now open. . ." denotes a single roadway rather than a series of different roads or segments of roads.

- the route or "roadway" must be "*on the Northeast of the land herein conveyed*," the Frazer lot.

(Emphasis added.) The third requirement is dispositive.

The ordinary meaning of the preposition "on," within the phrase "on the Northeast of the land herein conveyed," denotes that, at a minimum, the "roadway" must be located in a northeasterly direction from or relative to the Frazer lot.[9] Also, as appellants further emphasize, "on" is often used to denote abutting or adjacent land.[10] Under either meaning, the easement route declared by the district court, which begins at present-day Hurst View and continues eastward onto the Point, cannot, as a matter of law, be considered "on the Northeast" of the Frazer lot. As demonstrated in Appendices A and B, the court's easement route instead begins at a point to the *south*east of the Frazer lot. Nor is the route abutting or adjacent to the Frazer lot, but is instead separated from it by the width of Oak Hurst and a portion of the Dolan lot. And, as Appendix A also shows, the only "roadway . . . on the Northeast" of the Frazer lot, under either definition, is Oak Hurst.

---

[9] *See Webster's Third New Int'l Dictionary* 1574 (2002) (defining "on" as a word used to indicate "contiguity" or a "position with regard to place, direction, or time").

[10] *See Fort Worth & N.O. Ry. Co.*, 18 S.W. 206, 208 (Tex. 1891) (noting that "in" denotes "nearness" or "proximity" more definitely than "at" does); *Blackert v. Dugosh*, 145 N.E.2d 606, 607 (Ill. 1957) (holding that preposition "on" was "strongly indicative on an intent to convey" abutting land in deed under consideration); *see also Webster's* at 1574 (emphasizing contiguity definition of "on" as "location closely adjoining something . . . or location very near some point of a narrowly extended area").

32

The Gays have not seriously disputed that, geographically speaking, the court's easement route is not "on the Northeast" of the Frazer lot. They have likewise acknowledged that the road now known as Oak Hurst was "now open" as of May 1945 and that, all other things being equal, that road would have fit the description of a "roadway now open on the Northeast" of the Frazer lot. Nonetheless, the Gays successfully persuaded the district court to disregard the easement's literal text in the view that (1) the easement was explicitly intended "for the purpose of ingress and egress to Lake Travis," and (2) an easement over Oak Hurst would thwart, rather than achieve, this purpose because this "roadway" did not in itself reach Lake Travis, but ran in an inverted "U" shape within the interior of the Graveyard Point peninsula.[11] The Gays also advanced a broader theory that the Stewarts collectively intended to pursue a common development "plan or scheme" in which lot owners were to have broad rights to access and enjoy the lake, and to that end reserved the Point and Notch for the use of owners who, like appellees, lacked lakeside frontage. The district court made several findings to this effect. Neither theory is a valid basis for deviating from the text that Annie Stewart actually used.

It is true that our reliance on the plain meaning of contractual text must in some instances be qualified when that construction would yield a result that the parties manifestly could not have intended. *See Lane v. Travelers Indem. Co.*, 391 S.W.2d 399, 402 (Tex. 1965) (refusing to construe contract in manner that would lead to absurd results); *Avasthi & Assocs., Inc. v. Banik*, 343 S.W.3d 260, 264 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (declining to

---

[11] In support of this theory, the district court found that the 1951 aerial photograph in evidence "depicts the roadway now named Oak Hurst as an inverted "U" shaped road that does not provide an access route to Lake Travis."

accept construction of contract that would produce absurd results because there was construction that would not produce absurd result); *see also Harbor Ventures*, 2012 WL 1810205, at * 8 (contracts are construed with an eye to the "particular activity sought to be served") (citing *Frost Nat'l Bank*, 165 S.W.3d at 312). That is the essence of the Gays' arguments regarding Oak Hurst and their emphasis on the fact that the street does not, in itself, reach Lake Travis. Appellants concede that Oak Hurst does not itself reach Lake Travis. However, this does not mean, as the Gays suggest, that an easement over Oak Hurst would fail to effectuate Annie Stewart's manifest "purpose of ingress and egress to Lake Travis."

As demonstrated by undisputed and conclusive evidence that includes Appendix A, aerial photographs, and testimony, the road now known as Oak Hurst terminates at its western end at Hurst Creek Road, which runs in a roughly north-south direction along what is now the western side of the Graveyard Point peninsula. It is likewise undisputed that Hurst Creek Road predates the construction of Mansfield Dam and has been a public road at all relevant times. The dam's construction caused the northern portions of Hurst Creek Road to be inundated off of what became the northwestern shore of Graveyard Point, leaving the remaining portions of the road leading from the Oak Hurst terminus as a means of access to the lake waters. Consequently, the owner of the Frazer lot could have accessed the lake by traveling from the lot westward on Oak Hurst to its terminus at Hurst Creek Road, then northward to the shore. While appellees insist that this arrangement would have been inconsistent with the easement's reference to a singular "roadway," only an easement over the Oak Hurst portion of the route was necessary to secure "the purpose of ingress and egress to Lake Travis"—once a lot owner traversed the still-private, Stewart-owned

34

Oak Hurst to the road's western end, he or she could travel over a public roadway, which required no easement to use, to reach the lake waters.

That an easement over Oak Hurst would satisfy the parties' manifest "purpose of ingress and egress to Lake Travis" is further demonstrated by considering, again, the nature and scope of the "ingress and egress" right that Annie Stewart granted. As we held above, it is merely a right to pass to and from Lake Travis and engage in a limited range of activities reasonably related thereto—not, as the Gays have assumed, and the district court held, a right to engage in a broader range of recreational activities on the lake's shore and in the adjacent waters. This limited right would be effectuated by an easement to traverse the private road of Oak Hurst in order to reach a public road leading to the lake waters.

In short, this is not a case where our plain-meaning construction of easement language yields a result that the parties could not have intended. *See Lane*, 391 S.W.2d at 402; *Avasthi*, 343 S.W.3d at 264. As for the Gays' broader "common plan or scheme of development" theory, it amounts to an invitation to improperly consider extrinsic or parol evidence of the parties' intent in derogation of the unambiguous text they actually used. *See Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981) ("'It is the general rule of law of contracts that where an unambiguous writing has been entered into between the parties, the courts will give effect to the intention of the parties as expressed or as is apparent in the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls.'" (quoting *City of Pinehurst*, 432 S.W.2d at 518)). In any event, we observe that appellees' evidence of this supposed "plan or scheme" actually tends to undermine, rather than

35

support, any notion of a common plan in which interior lot owners on Oak Hurst were given access to the lake via the Point and Notch.

In support of this and other theories at trial, appellees presented considerable evidence regarding the history of the development of A.K. and Annie Stewart's Graveyard Point property by the couple and Annie's heirs. This evidence included a summary of abstract prepared by Kent McMillian, a surveyor, reflecting dozens of conveyances by the couple and Annie's estate, lake-access and road easements they granted, and any express restrictions imposed against commercial use of the properties being conveyed. The summary reflects that in June 1945, within a month after executing the Frazer, Sassman, and Dolan deeds, Annie executed the Dyer deed and granted an express easement identical to those in the three prior deeds except for the directional language—it granted a right of "ingress and egress to Lake Travis" over "the roadway now open to the North of the land herein conveyed." As Appendices A and B demonstrate, the easement route declared by the district court cannot conceivably be considered a "roadway to the North of the land herein conveyed" of the Dyer lot. Only the road now known as Oak Hurst would fit that description. The same is also true of a 1951 Annie Stewart conveyance of a lot on Oak Hurst located near the street's western terminus with Hurst Creek Road, the Monaghan lot—she granted an easement over "the roadway now open on the *West* of the land herein conveyed . . . for the purpose of ingress and egress to Lake Travis." Again, the road now known as Oak Hurst lay "on the West" of this lot, and the easement route declared by the district court was situated in completely the opposite direction. In short, if there is a "common plan or scheme" of development suggested by this evidence, it is that Annie Stewart consistently intended that the owners of interior lots along the

36

road now known as Oak Hurst would have easements permitting them to access Lake Travis via Oak Hurst and then Hurst Creek Road.

Giving effect to the plain and ordinary meaning of the easement, we hold that the evidence shows conclusively that "the road now open on the Northeast of the land herein conveyed" in the Frazer deed refers to the road that is, in fact, "on the Northeast" of that lot—the road now known as Oak Hurst, not the easement route that the district court declared. *See Marcus Cable*, 90 S.W.3d at 702. In other words, the Gays own no express easement granting them a right to use the Point or Notch. We sustain appellants' first issue with respect to the Gays.[12]

### *Location of the Johnstons' easements*

We now consider whether the district court erred in holding that any of the easements in the Johnstons' chain of title burden the Point or Notch. Given that the text of the Sassman and Dolan easements are parallel to the easement granted in the Frazer deed, differing only with respect to the directional reference, the parties have relied largely on the same arguments, evidence, and findings with respect to all three. And given the similarities between these two sets of easements (not to mention also the Dyer and Monaghan easements), our above analysis concerning the Frazer easement would arguably apply to the Sassman and Dolan easements as well—"the roadway

---

[12] At trial, appellees also advanced a theory that the dedication of roadways in the 1961 plat of the Annie Stewart Subdivision had independently granted both the Gays and Johnstons an easement over the roadways to and over the Point and Notch. Appellees do not appear to rely on this theory on appeal, although they reference the dedication as support for their estoppel theory. Similarly, while the district court's finding of fact and conclusion of law referenced the 1961 dedication in regard to appellees' estoppel theory, the court did not appear to rely on the dedication to support its conclusions regarding an express-easement theory. To the extent that the court's conclusions or judgment did rest upon an express-easement theory predicated on the 1961 dedication, it would be in error. Among other things, the dedication does not depict the Point or Notch or any roads there.

now open on the East of the land herein conveyed" in the Sassman or Dolan easements would, in the same way, refer to the road now known as Oak Hurst and not the easement route declared in the judgment.

On the other hand, if one considers the Sassman or Dolan easement independently from the foregoing analysis, the meaning and application of the directional language becomes less clear. Unlike the situation with the Frazer deed, application of the directional language reveals a potential ambiguity—not only Oak Hurst but Hurst View and the remainder of the court's easement route could reasonably be said to be "on the East" of the Sassman and Dolan lots. However, this potential ambiguity would exist only if the road now known as Hurst View had in fact been opened by the time of the Sassman and Dolan conveyances in May 1945. Consequently, that issue becomes of paramount importance with respect to the Johnstons' rights, and the parties devote much of their appellate briefing to disputing whether or not sufficient evidence supports the district court's findings that Hurst View had been opened by May 1945.

We need not reach these contentions, however, because our review of the district court's findings of fact and conclusions of law reveals that an essentially unchallenged alternative theory supports the judgment that the Johnstons own an express easement permitting ingress and egress to Lake Travis via the Point and Notch. As previously noted, the district court made legal conclusions that the Johnstons had acquired a "perpetual express easement appurtenant" that ran with each of their seven lots. These lots included "Offutt Parcels Nos. 2 and 3." The express easement that Annie Stewart's estate granted with those two lots, the court further found, and the evidence conclusively establishes, affords "the Grantees, their heirs and assigns, the right of ingress and egress to and from said property and to and from the waters of Lake Travis over the

38

existing roadways." By the date of this deed, 1965, it is established by other unchallenged findings and undisputed evidence that Hurst View had been opened,[13] and that the remainder of "the roadway connecting Oak Hurst Road with the Davis Parcel," as well as the "roadway on the Davis Tract," including the lake-access loop, had existed since the early 1950s. Consequently, an easement over "the existing roadways" on Graveyard Point circa 1965 would have encompassed the entirety of the easement route declared by the district court.[14] Accordingly, we overrule appellants' first issue with respect to the Johnstons.

However, we emphasize again that, per our disposition of appellants' second issue, the express easement granted in the 1965 deed to the Offutt Nos. 2 and 3 lots is limited solely to a right of "ingress and egress to Lake Travis," not the right to maintain boats and boat docks and engage in broader recreational activities. If the Johnstons possess any broader rights to use the Point or Notch, they, like the Gays, must look to legal sources outside of any express easements they own.

---

[13] Although they hotly disputed whether the road now known as Hurst View had been opened by the time of Annie's earlier conveyances, appellants acknowledge that it was open by 1951. Consequently, it is beyond dispute that Hurst View was an "existing roadway" thereafter.

[14] To the extent it might be debatable whether the lake-access loop on the Point would be considered a "roadway" within the meaning of the easement, that issue would be obviated by application of the following principle: Where an express easement is described generally, without indicating its location (e.g., precisely where or how one was to obtain "ingress and egress to and from the waters of Lake Travis over the existing roadways") and the grantor does not specify its location, the grantee's use of the easement, with the grantor's consent or acquiescence, is sufficient to establish the easement's location. See Vinson v. Brown, 80 S.W.3d 221, 228 (Tex. App.—Austin 2002, no pet.). At trial, as previously noted, the parties stipulated that Douglas Offutt, the original grantee of Offutt parcels 1, 2, and 3, and who had also acquired several other lots in in the Johnstons' chains of title, "used Hurst View and [appellants'] properties to access Lake Travis . . . from at least 1958 through 1985," and unchallenged findings reflect that Offutt and other predecessors in title "have used Hurst View, the Notch, and the Point, including the entire circular access roadway on the Point to access . . . the lake continuously since as early as 1958." The findings, stipulations, and evidence would have served to fix the location of the easement as the path of the lake-access loop and any intervening portions of the Point or Notch between the loop and the water.

**Prescription?**

In their fifth issue, appellants challenge the legal and factual sufficiency of the evidence supporting the district court's findings and conclusions that appellees had acquired the positive easements declared in the judgment under a prescription theory. A prescriptive easement may arise from a property owner's knowing acquiescence (whether actual or constructive) in a claimant's adverse use of the property under a claim of right continuously for ten years or more. *See Scott v. Cannon*, 959 S.W.2d 712, 721 (Tex. App.—Austin 1998, pet. denied); *Wiegand v. Riojas*, 547 S.W.2d 287, 290 (Tex. Civ. App.—Austin 1977, no writ). The ten-year requirement may be established by tacking successive interests if there is "'privity of estate between each holder and his successor.'" *Boerschig v. Southwestern Holdings, Inc.*, 322 S.W.3d 752, 756 (Tex. App.—El Paso 2010, no pet.) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 16.023 (West 2002) for proposition that tacking allowed for establishing prescriptive easement); *Kleckner v. McClure*, 524 S.W.2d 608, 611 (Tex. Civ. App.—Fort Worth 1975, no writ) (noting that successive periods of adverse possession by those in privity can be tacked or added together to satisfy 10-year limitations period). Likewise, once a prescriptive easement is established, it can be passed on to successors. *See First Nat'l Bank v. Beavers*, 602 S.W.2d 327, 329 (Tex. Civ. App.—Texarkana 1980, no writ) (citing *Martin v. Burr*, 228 S.W. 543 (Tex. 1921)).

The "adverse" use that can give rise to prescription is the same required to prove adverse possession. *See Scott*, 959 S.W.2d at 722. It requires that the claimant have acted under a "claim of right"—with intent to use the property in a particular way permanently, as a matter of right, as distinguished from merely trespassing or using the property with or subject to the rightful owner's permission. *See Vrazel v. Skrabanek*, 725 S.W.2d 709, 711 (Tex. 1987); *Ellis v. Jansing*,

620 S.W.2d 569, 571–72 (Tex. 1981). Relatedly, the claim of right must be inconsistent with the landowner's legal rights to use the property, *see Scott*, 959 S.W.2d at 722, although this "does not require an intention to dispossess the rightful owner, or even know there is one," *see Tran v. Macha*, 213 S.W.3d 913, 915 (Tex. 2006) (per curiam).

The adverse use must also have been "open," i.e., not made in secret or stealthily, and "notorious," either known to the property owner or so widely known in the area that the property owner would reasonably be expected to know of it. *See Cambridge Holdings, Ltd. v. Cambridge Condos. Council of Owners*, No. 03–08–00353–CV, 2010 WL 2330356, at *10 (Tex. App.—Austin June 11, 2010, no pet.) (mem. op.) (citing *Restatement (Third) of Property (Servitudes)* § 2.17 cmt. h). Similarly, the claim of right must have been "hostile," or having outward manifestations of such nature and character as to notify the property's true owner that the claimant is asserting such a claim and is not merely acting with or subject to the owner's permission. *See Scott*, 959 S.W.2d at 722; *City of Austin v. Hall*, 48 S.W. 53, 55–56 (Tex. Civ. App.—Austin 1898, no writ). "As this Court has stated, there must be a *distinct* and *positive assertion* of a right which is brought to the servient owner's attention and which is hostile to the owner's rights." *Scott*, 959 S.W.2d at 722 (citing *Wiegand*, 547 S.W.2d at 289). Such an assertion may come in the form of a direct verbal assertion of a claim or be established by the character of the use of the property and surrounding circumstances. *See Orsborn v. Deep Rock Oil Corp.*, 267 S.W.2d 781, 787 (Tex. 1954) ("Claim of right must be manifested by declaration or by open or visible act. If there is no oral assertion of claim to the land brought to the knowledge of the landowner, the adverse possession must be so open and notorious and manifested by such open or visible act or acts that knowledge on the part of the owner will be presumed.").

41

For the use of property in itself to constitute the requisite "distinct and positive" assertion" of a right in the property hostile to the owner's rights, the claimant's use of the property must be "exclusive" of the owner's use—i.e., the claimant has excluded or attempted to exclude the property owner from using the same property for the same purpose. *See Brooks v. Jones*, 578 S.W.2d 669, 674 (Tex. 1979) ("While other jurisdictions do not require the prescriptive use to be exclusive [of] use by the owner of the land, this rule of property has long been the established rule in Texas."). It follows—and is equally well established—that proof merely of a joint use of the property with the owner cannot establish a prescriptive easement because it does not signal an adverse claim of right but is consistent with permissive use. *See id.* at 673–74; *Scott*, 959 S.W.2d at 721–22. However, this Court has previously held that proof of joint rather than exclusive use is not necessarily fatal to a prescriptive-easement claim if the claimant makes some form of "distinct and positive assertion" of a hostile claim of right that is separate and apart from the claimant's joint use of the property. *See Scott*, 959 S.W.2d at 721–23.

"[C]reation of an easement by prescription is not favored in the law." *Wiegand*, 547 S.W.2d at 289. Evidence of a prescriptive easement "must be clear and positive, and should be strictly construed." *Callan v. Walters*, 190 S.W. 829, 832 (Tex. Civ. App.—Austin 1916, no writ). Before courts will take the "severe step" of "taking real estate from a record owner without express consent or compensation . . . the law reasonably requires that the parties' intentions be very clear." *Tran*, 213 S.W.3d at 915.

The district court made the following findings that are material to a prescription theory:

- [Appellees] and their predecessors in title . . . have used and enjoyed the Notch (the Desmond Tract) and the Point (the Davis Tract), including Hurst View, Hurst Creek Circle, and the circular access roadway on the Point, to access and engage in the recreational use and enjoyment of Lake Travis, including lingering on the shore line and water's edge and maintaining boats and boat docks, in a manner that was open, notorious, continuous, and exclusive, and in a hostile and adverse manner for [a] period of more than 10 years prior to February 2, 2006.

- The use of the Notch (the Desmond Tract) and the Point (the Davis Tract), including Hurst View, Hurst Creek Circle, and the circular access roadway on the Point, by the Johnstons and the Gays, and the predecessors in title to the Johnston Tracts and the Gay Tracts, to access and engage in the recreational use and enjoyment of [] Lake Travis, including lingering and the shore line and water's edge and maintaining boats and boat docks, was of such a nature and character as to notify the title owners of the Notch and the Point of a hostile claim.

- There were distinct and positive assertions by the Johnstons and the Gays, and the predecessors in title to the Johnston Tracts and the Gay Tracts, of a right to use the Notch (the Desmond Tract) and the Point (the Davis Tract), including Hurst View, Hurst Creek Circle, and the circular access roadway on the Point, to access and engage in the recreational use and enjoyment of [] Lake Travis, including lingering at the shore line and water's edge and maintaining boats and boat docks, that were brought to the attention of the title owners of the Notch and Point and such assertions were hostile to the owner's rights.

- There was privity of estate between each holder of this prescriptive easement right and their successor.

- For a period of well over 10 years prior to February 2, 2006, the owners of the Johnston Tracts and the Gay Tracts, their guest[s], family members, and invitees have used Hurst View, the Notch and the Point, including the portion of Hurst Creek Circle and circular access roadway on the Point, to access and engage in the recreational use and enjoyment of [] Lake Travis, including maintaining of boats and boat docks, swimming, fishing, picnicking, sunbathing, use of umbrellas or other sunshades, barbequ[e]ing, recreational games, nighttime use, boat launching, automobile and other vehicle parking while engaging in recreational activities, and automobile and boat trailer parking while boating or fishing, and all other similar lawful uses of shoreline at the water's edge fronting the Notch and the Point.

Appellants do not challenge the district court's findings regarding the nature of the uses of the Point and Notch by appellees and their predecessors or that such uses met the requirements of being "open," "notorious," and "continuous" for ten years or more; indeed, they

43

stipulated to many of these facts at trial. *See Brooks*, 578 S.W.2d at 673; *Scott*, 959 S.W.2d at 721. They focus instead on the court's findings regarding the adversity, hostility, and exclusivity of the uses.

Appellants contend that the evidence was legally insufficient to support the district court's findings of adversity and hostility because the evidence is conclusive that the uses, including the mooring of boat docks, began with a grant of permission from Arthur Stewart, the executor of Annie Stewart's estate. They rely on the testimony to this effect from Mary Stewart Hicks, to which we alluded previously, and invoke the well-established rule that continuous use of an easement by permission of the servient estate owner, "no matter of what period of time, cannot subsequently ripen into a prescriptive right." *See Wiegand*, 547 S.W.2d at 290. Under this rule, moreover, it is presumed that any use of the property following the grant of permission continues to be permissive rather than adverse. *Id.* To rebut this presumption and "transform permissive use of an easement into an adverse use, there must be a distinct and positive assertion of a right which is brought to the servient owner's attention and which is hostile to the owner's rights." *Id.* Appellants urge that any uses of the Point and Notch by appellees' predecessors thus originated as permissive use and that the earliest "distinct and positive assertion[s] of a right . . . hostile to the owner's rights" capable of rebutting the presumption of continued permissive use were appellees' September 2001 claims to the Stewart heirs' counsel invoking the express easements in their deeds. Although appellants acknowledge that appellees' continued use of the Point and Notch would likely have been considered adverse and hostile from that point forward, they emphasize, and it is undisputed, that their acquiescence in the use thereafter ended well short of the ten-year period required for prescription.

44

Although adversity can be inferred from the nature and circumstances of the use, *see Scott*, 959 S.W.2d at 721–22, there is no evidence that directly controverts Hicks's assertion that third-party use of the Point and Notch began with a grant of permission from Arthur Stewart. Consequently, if Hicks's testimony to that fact is credited, it would negate, as a matter of law, any inference that subsequent uses were adverse until there occurred a "distinct and positive assertion of a right which is brought to the servient owner's attention and which is hostile to the owner's rights" beyond the mere continuation of the use that originated with permission. *See Wiegand*, 547 S.W.2d at 290. Appellants urge that the district court was bound to credit Hicks's testimony on this point because it was uncontroverted and, in their view, conclusive. *See City of Keller*, 168 S.W.3d at 815 (explaining that conclusive evidence of a fact cannot be disregarded). Evidence is conclusive "only if reasonable people could not differ in their conclusions, a matter that depends upon the facts of each case." *See id.* at 816. In other words, Hicks's testimony that her uncle Arthur gave permission to use the Point and Notch property would be conclusive, and legally binding on the district court, if a reasonable fact-finder could logically infer only that it was true and could not logically infer that it was false or inaccurate. *See id.* Uncontradicted witness testimony is said to be conclusive when it is clear, direct, positive, free from contradictions, inconsistencies, and circumstances tending to cast suspicion on it. *See Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990) ("'[W]here the testimony of an interested witness is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law.'" (quoting *Cochran v. Wool Growers Cent. Storage Co.*, 166 S.W.2d 904, 908 (Tex. 1942)).

Although "[i]t is impossible to define precisely when undisputed evidence becomes conclusive," *see City of Keller*, 168 S.W.3d at 815, we are persuaded that Hicks's testimony falls short of being incapable of being disbelieved by a reasonable fact-finder.  The entirety of Hicks's testimony regarding the permission issue consists of the following exchange:

> Q.   [by appellants' counsel]:  Did someone in your family that you are aware of give permission to people to use that property?
>
> A.   Yes.[15]
>
> . . . .
>
> Q.   And who would that be?
>
> A.   My uncle, Arthur Stewart.
>
> Q.   And do you know who he gave permission to or what kind of permission he gave?
>
> A.   I know that he gave permission to people to—they could put their boat docks down there.

Hicks did not elaborate on the basis for her knowledge of this purported grant of "permission" beyond indicating that decades later, in the mid-2000s, she became involved in managing the property still owned by Annie Stewart's estate; there is no indication as to whether or how Hicks would have obtained first-hand or contemporaneous knowledge of that fact.  The district court also could have considered Hicks's young age at the time this grant of permission supposedly occurred—during her childhood or preteen years—and that Hicks displayed some misunderstanding

---

**15** Appellees' counsel attempted to object to the question on grounds of speculation, but Hicks intoned the answer before counsel could assert it.

and confusion when testifying to various other facts from this era. These included facts relating to conveyances by her grandparents and her assertion, belied by the 1951 aerial photograph, that all or part of the lake-access loop had been constructed by persons to whom Arthur had granted "permission" to use the Point and Notch. Finally, there are portions of Hicks's testimony that a reasonable fact-finder could have found somewhat dubious, including her insistence during cross-examination that, notwithstanding the survey that Sanders prepared showing the lake-access loop and the fact that the heirs sold the property without warranties, she had "no idea" that the Point had been burdened by any easements before she sold it to Davis. We are to defer to the district court's first-hand assessments of Hicks's credibility and demeanor, and those assessments rationally could have informed the court's view of her other testimony. *See City of Keller*, 168 S.W.3d at 819; *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000) ("Because the trier of fact has the ability to examine the witness's demeanor, we must defer to its credibility determinations."). In light of these circumstances, we conclude that the district court could have reasonably either believed or disbelieved Hicks's assertion that third-party use of the Point and Notch began with a grant of permission from Arthur Stewart, and it acted within its discretion in doing the latter. *See City of Keller*, 168 S.W.3d at 815–16. And, the district court having disregarded Hicks's testimony to that fact, the testimony does not negate the adversity of the use of the properties by appellees' predecessors in title.

Appellants next argue that the evidence is legally or factually sufficient to support the district court's findings of the requisite "exclusivity" of use by appellees' predecessors. As appellants emphasize, there is no evidence that third-party use of the Point and Notch was ever fully exclusive of the property's use by the Stewart family. Hicks described the family's use of the

47

property as "our access to the water" and for picnicking, fishing, and "just walking down there and looking around, whatever," although she indicated such use by the family had become "off an[d] on" by the 1960s or 1970s. There was also evidence that the Point and Notch functioned as a parking area for patrons and invitees of Emmet Stewart's nearby marina during its years of operation. Consequently, evidence merely that appellees' predecessors continuously used the Point and Notch in the same way cannot give rise to prescription as to those common uses. *See Brooks*, 578 S.W.2d at 673–74; *Scott*, 959 S.W.2d at 721–22.

As appellees appear to recognize, they must instead rely on some "distinct and positive assertion" of a hostile claim of right that is separate and apart from their predecessors' continuous use of the property in common with the Stewarts. *See Scott*, 959 S.W.2d at 721–23. Appellants urge that there is no evidence, or factually insufficient evidence, to support the district court's findings of "distinct and positive assertions by the Johnstons and the Gays, and the predecessors in title . . . of a right to use the Notch (the Desmond Tract) and the Point (the Davis Tract), including Hurst View, Hurst Creek Circle, and the circular access roadway on the Point, to access and engage in the recreational use and enjoyment of [] Lake Travis, including lingering at the shore line and water's edge and maintaining boats and boat docks, that were brought to the attention of the title owners of the Notch and Point [that] . . . were hostile to the owner's rights." We disagree.

While we would reach a different result if appellees were relying solely on proof that their predecessors used the Point and Notch for lake access and recreation in a manner similar to the Stewarts, we think that the predecessors' decades-long uses far greater in scope—their maintenance of boat docks at the Point and Notch—amount to the sort of "distinct and positive assertion" that can distinguish an adverse and hostile claim of right from joint (and presumptively permissive) use.

48

There is no contention that the Stewarts ever maintained a boat dock at the Point or Notch; consequently, that use of the property is not a joint use in common with the Stewarts' use. Also, while the right to maintain a boat dock is analyzed under the rubric of a "use" of property and thus easement law rather than the doctrine of adverse possession,[16] such a use is possessory in nature, akin to locating a mobile home or other structure on the property. A boat dock of this type floats on the water near shore, but it must be physically attached or anchored to the dry land to keep it from drifting and it must be close enough to the land for access, which access often includes a ramp of some sort that is also attached to the land. It is also exclusive in nature—in fact, there was evidence that at least some of the boat docks at the Point and Notch had "no trespassing" signs, and there is no evidence that the Stewarts ever used the boat docks. In these ways, this type of "use" is more closely analogous to the construction of the garage and driveway referenced in *Tran*—i.e., "We agree that building a structure on property may be sufficient evidence of adverse possession." *Tran*, 213 S.W.3d at 915—than it is to the mere use of the garage and driveway. *See id.* It is a use that is uniquely adverse or hostile to the servient estate and it is a possessory-type use in that it requires some form of continuing, physical possession, albeit small, of the real property.

As for whether or when the maintenance of boat docks was ever brought to the Stewarts' attention, *see Wiegand*, 547 S.W.2d at 290, the district court was within its discretion to credit Hicks's acknowledgment that the family was aware of those activities from their inception. For these reasons, we conclude that there is legally and factually sufficient evidence of the requisite

---

[16] *See, e.g.*, *Werchan v. Lakewood Estates Ass'n*, No. 03–08–00417–CV, 2009 WL 2567937, at *4–9 (Tex. App.—Austin Aug. 21, 2009, pet. denied) (mem. op.) (analyzing existence of prescriptive easement allegedly established by mooring a floating dock on alleged servient estate).

adversity and hostility in the uses of the Point and Notch by appellees' predecessors, notwithstanding the more limited range of joint uses they shared in common with the Stewarts.[17]

Appellants also suggest that the requisite adversity and hostility are lacking because it is undisputed that appellees' predecessors' use of the Point and Notch was not exclusive of other third parties. Appellants assert that the predecessors' use "did not differ materially from contemporaneous recreational use by the public generally." *See Fannin v. Somervell Cnty.*, 450 S.W.2d 933, 935 (Tex. Civ. App.—Waco 1970, no writ) (holding that prescriptive easement could not arise on unenclosed waterfront property used by general public solely for recreation and pleasure). As an initial observation, the evidence, contrary to appellants' assertions, supported the reasonable inferences that (1) only a relatively limited number of third parties maintained boat docks at the Point and Notch during the relevant period—witness estimates indicated 4-5 total at most, and the aerial photographs showed as few as two—and (2) these third parties consisted of fellow owners of lots on Graveyard Point. Relatedly, while we have sometimes stated imprecisely that a prescriptive easement claimant's use of property must be "exclusive" not only of the property owner,

---

[17] Hicks's testimony that "the people that used our property" had constructed all or part of the lake-access loop, including moving large rocks and felling trees, was also evidence of the sort of distinct and positive assertion of a hostile claim of right that could distinguish adverse use notwithstanding joint use. *See Reid Estates Civic Club v. Boyer, Inc.*, No. 01–09–00282–CV, 2011 WL 6938513, at *6 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) (involving acts extending and improving roadway); *Boerschig v. Southwestern Holdings, Inc.*, 322 S.W.3d 752, 766 (Tex. App.—El Paso 2010, no pet.) (involving acts enclosing road with fence on one side and gate on one end); *Terrill v. Tuckness*, 985 S.W.2d 97, 108 (Tex. App.—San Antonio 1998, no pet.) (building fence around tract). However, the evidence falls short of permitting a reasonable inference as to whether any of appellees' predecessors, as opposed to other third-party users of the property, were involved in the construction. *See Tran v. Macha*, 213 S.W.3d 913, 915 (Tex. 2006) (declining to find possession hostile despite existence of improvements because evidence only showed who used driveway and garage, but not who built them).

but "of all other persons,"[18] this is plainly not the case literally. *See Reid Estates Civic Club v. Boyer, Inc.*, No. 01–09–00282–CV, 2011 WL 6938513, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.). For example, we have recognized that parallel prescriptive easements can ripen simultaneously in favor of more than one claimant based upon acts that manifest independent adverse and hostile claims of right. *Nickels v. Casburg*, No. 03–05–00027–CV, 2009 WL 1708830, at *16 (Tex. App.—Austin June 18, 2009, pet. denied) (mem. op.) (holding that sufficient evidence supported findings that over twenty-five property owners in subdivision had acquired prescriptive easements over waterfront property through collective longstanding use by themselves and their predecessors). More broadly, the role of the "exclusivity" inquiry, again, is to distinguish adverse and hostile third-party uses from those that are equally consistent with uses subject to permission. *See Brooks*, 578 S.W.2d at 673–74; *Scott*, 959 S.W.2d at 721–22. While uses in common with members of the general public are considered consistent with permissive use, *see Othen v. Rosier*, 226 S.W.2d 622, 627 (Tex. 1950) (citing *Weber v. Chaney*, 5 S.W.2d 213, 214 (Tex. Civ. App.—San Antonio 1928, writ ref'd)); *Fannin*, 450 S.W.2d at 935, there is proof of more than that here.

Finally, appellants argue that to the extent any appellees hold an express easement permitting "ingress and egress" over the Point and Notch, it could not be enlarged by prescription. *See McNally v. Guevara*, 989 S.W.2d 380, 383 (Tex. App.—Austin 1999), *rev'd on other grounds*, 52 S.W.3d 195 (Tex. 2001) (relying on *Kearney & Son v. Fancher*, 401 S.W.2d 897, 903–05 (Tex. Civ. App.—Fort Worth 1966, writ ref'd n.r.e.), to hold that holder of express easement

---

[18] *See Werchan*, 2009 WL 2567937, at *5.

51

permitting ingress and egress "cannot enlarge that right to include parking by prescription"). This argument is applicable solely to the Johnstons because we have held that only they, not the Gays, hold an express easement permitting ingress and egress over the Point and Notch. Nevertheless, we disagree that these cases establish a categorical rule that the holder of an express easement cannot obtain a prescriptive easement.

First, *Kearney* did not hold that a "a grant of a specific easement may not be enlarged by prescription," *see McNally*, 989 S.W.2d at 383; rather, in construing the text of the express easement, it relied on the general rules regarding contract construction to hold that because the terms of the grant were specific—i.e., "to use the railroad switch track and grounds"—"the limits of the use may not be enlarged" to include a general right to use the property as a driveway after the property was no longer being used for railroad purposes. *See Kearney*, 401 S.W.2d at 903. And in addressing the possibility of an enlargement through prescription, the *Kearney* court relied not on the above expressed rule regarding expansion of an express easement, but on the fact that the party asserting such a claim had signed an agreement that any use of the easement in excess of the express grant "will be permissive only, and shall not be the basis of any prescriptive right or rights." *Id.* Thus, *Kearney* does not control our decision here. As to *McNally*, which relies solely and completely on *Kearney* for the proposition that a specific easement may not be enlarged by prescription, it is distinguishable because it did not involve the distinct and positive assertion of a right that is completely outside the scope of the express easement—i.e., hostile to the owner's rights. In contrast, as discussed above, the facts of this case show that appellees' use of appellants' property to moor their boats was a distinct and positive assertion of a right that was hostile to appellants' rights without regard to their express easement for ingress and egress to Lake Austin.

52

We overrule appellants' fifth issue challenging the district court's findings and conclusions supporting a prescription theory. Because this theory independently supports the positive easements declared in the district court's judgment, we need not reach appellants' challenges regarding the alternative estoppel and implication theories on which the court relied. *See* Tex. R. App. P. 47.1.

**Negative implied restrictive covenant**

In their sixth issue, appellants contend that the evidence was legally and factually insufficient to support the district court's judgment that a negative implied reciprocal restrictive covenant bars commercial use of the Point and Notch. We agree.

As previously noted, it is undisputed that neither the Point nor the Notch is burdened with any express restriction prohibiting their commercial use. In holding that a commercial-use restriction existed nonetheless, the district court relied on what is known as the implied reciprocal negative easement (or, more generally, equitable servitude) doctrine. The Texas Supreme Court has articulated the following "reasonably accurate general statement of the doctrine":

> [W]here a common grantor develops a tract of land for sale in lots and pursues a course of conduct which indicates that he intends to inaugurate a general scheme or plan of development for the benefit of himself and the purchasers of the various lots, and by numerous conveyances inserts in the deeds substantially uniform restrictions, conditions and covenants against the use of the property, the grantees acquire by implication an equitable right, variously referred to as an implied reciprocal negative easement or an equitable servitude, to enforce similar restrictions against that part of the tract retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions and covenants.

53

*Evans v. Pollock*, 765 S.W.2d 465, 466 (Tex. 1990) (quoting *Minner v. City of Lynchburg*, 129 S.W.2d 673, 679 (Va. 1963)) (citations omitted). In order to impose a restrictive covenant by implication on property retained by the original grantor, there must be evidence that (1) the grantor intended to adopt a scheme or plan of development that encompassed *both* the property conveyed *and* the property retained, and (2) the grantor subdivided the property into lots and included in the deeds of the properties conveyed substantially uniform restrictions designed to further the scheme or plan. *See id.* Under these circumstances, the burden the grantor has placed on the land conveyed is considered to be imposed, by operation of law, on the land he retained. *See Saccomanno v. Farb*, 492 S.W.2d 709, 713 (Tex. Civ. App.—Waco 1973, writ ref'd n.r.e.) (citing 20 *Am. Jur. 2d Covenants, Conditions and Restrictions* § 733 (1965)). When seeking to impose the restrictive covenant on property retained initially by the grantor but subsequently sold to a third party, there must also be evidence that the subsequent purchaser had actual or constructive notice of the existence of those restrictions on the other properties included in the scheme or plan of development. *See Evans*, 792 S.W.2d at 466.

As this Court recently emphasized in rejecting two similar attempts to impose a negative implied restrictive covenant on other Graveyard Point tracts based on a supposed "common scheme or plan of development" intended by A.K. and Annie Stewart, "'the doctrine should be used and applied with extreme caution, for it involves difficulty and lodges discretionary power in a court of equity to deprive a man of his property, to a degree, by imposing a servitude by implication,' . . . a practice consistent with 'the settled rule in Texas that alleged restrictive clauses in instruments concerning real estate must be construed strictly, and all doubts . . . resolved

54

in favor of the free and unrestricted use of the property.'" *Harbor Ventures*, 2012 WL 1810205, at *3 (quoting *Saccomanno*, 492 S.W.2d at 713); *accord Crosswater Yacht Club*, 2012 WL 1810213, at *3.

In support of its legal conclusion that "[t]he Notch and the Point are subject to a negative implied restrictive covenant that no commercial enterprises can ever be operated on the property," the district court found that "[a] common grantor developed the area surrounding the Notch and the Point for sale in lots and pursued a course of conduct indicating a general plan or scheme of development that purchasers of these lots would be (1) restricted from engaging in commercial enterprises and (2) granted express easements to access and engage in the recreational use and enjoyment of Lake Travis over a specified roadway ending at the Notch and the Point." In support of the court's finding that the required "general plan or scheme of development" existed were two sets of underlying findings. First, the court relied on findings that "[t]he substantial number of deeds from A.K. and Annie Stewart, and later their heirs, used to convey the lots surrounding the Notch and Point to grantees, other than heirs of A.K. and Annie Stewart, contain a substantially uniform restrictive covenant preventing the operation of commercial enterprises on the lots and tracts," which in turn "indicates the common grantors had a general plan or scheme of development that the area later known as the Notch and the Point would be restricted from commercial use." Second, the court relied on a finding that:

> A.K. and Annie Stewart's plan and scheme of development must have been that the Notch and the Point would not be used for commercial enterprises because it would have been nonsensical to provide that no commercial enterprises could ever be operated on any of the tracts immediately inland and then allow a commercial enterprise on the area reserved and burdened by the unqualified and perpetual express

55

easements appurtenant granting the right to access and engage in the recreational use and enjoyment of Lake Travis at this location.

Neither set of findings can support the existence of the required common development plan or scheme.

As we held in connection with appellants' first and second issues, the premise that the Stewarts pursued a common, uniform scheme or plan under which they granted "unqualified and perpetual express easements appurtenant granting the right to access and engage in the recreational use" of the Point and Notch is contrary to the unambiguous text of the easements Annie Stewart granted in her deeds to appellees' lots, not to mention her deeds to other lots along Oak Hurst. And absent any support for that erroneous premise regarding positive easements, the sole basis reflected in the findings for inferring the existence of a common scheme or plan entailing commercial-use prohibitions is that "a substantial number of deeds" from A.K. and Annie Stewart, and later their heirs," imposed "a substantially uniform restrictive covenant preventing the operation of commercial enterprises on the lots and tracts." This is not enough to establish a negative implied restrictive covenant. As we held in both *Harbor Ventures* and *Crosswater Yacht Club*, "[t]he fact that the original grantor inserts substantially similar restrictions in deeds of property conveyed, standing alone, is no evidence of a scheme or plan of development that could justify a similar implied restriction on property the grantor retained." *See Harbor Ventures*, 2012 WL 1810205, at *5; *accord Crosswater Yacht Club*, 2012 WL 1810213, at *4. Consequently, as was true in those cases, the district court erred in concluding from those findings that the Point and Notch are burdened by a negative implied restrictive easement prohibiting commercial use. In any event, the evidentiary record in this case leads us to echo the same observation we made in *Harbor Ventures*: "even if it

56

could be inferred that A.K. and Annie Stewart did have some sort of general plan or scheme of noncommercial development, the record suggests that any such plan encompassed only the landlocked properties . . . and did not include lakefront tracts" where commercial use restrictions were typically not imposed in their conveyances of those properties and a family member even operated a marina on one of those tracts for several years. *Harbor Ventures*, 2012 WL 1810205, at *6.[19]

For similar reasons, we also hold that the district court erred in making an additional legal conclusion that appellants were collaterally estopped from relitigating "the enforceability of the negative implied restrictive covenant against engaging in commercial enterprises on the Notch or the Point" by virtue of the *Mabry* judgment. Collateral estoppel, or issue preclusion, is designed to promote judicial efficiency, protect parties from multiple lawsuits, and prevent inconsistent judgments by precluding the relitigation of issues. A party seeking to assert the bar of collateral estoppel must establish that (1) the same facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the party against whom the doctrine is asserted was a party or in privity with a party in the first action. *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801–02 (Tex. 1994). Collateral estoppel "is more narrow than res judicata in that it only precludes the relitigation of identical issues of facts or law that were actually litigated and essential to the judgment in a prior suit." *Van Dyke*

---

[19] Of course, *Harbor Ventures* and *Crosswater Yacht Club*, founded as they are on the unique "findings, conclusions, and judgments of other trial courts . . . involving different parties, facts, and arguments," do not dictate or control the result in this case. *See Crosswater Yacht Club*, 2012 WL 1810213, at *5. Our analysis is instead based upon the governing legal principles applied to the record here.

*v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985). As appellants observe, the *Mabry* litigation concerned one of the large shoreline tracts that Annie Stewart gifted among her seven children—all without commercial use restrictions—in 1949 and the manner in which the grantee, Ernest Stewart, subdivided and developed the tract thereafter. The pivotal finding on which the trial court's judgment turned was "[t]he fact that every tract which was sold by Ernest C. Stewart contained the same restrictive covenant indicates that Ernest C. Stewart had the general plan that the block of land on the tip of the peninsula would be restricted from commercial use." These are not the same facts that were at issue in regard to the implied negative restrictive covenant theory in this case. Collateral estoppel did not bar appellants from litigating those facts here. *See Van Dyke*, 697 S.W.2d at 384.

We sustain appellants' sixth issue.

**Counterclaims**

In their seventh and final issue, appellants request that, to the extent we reverse the district court's judgment awarding relief to appellees, we likewise render judgment on their declaratory counterclaims and remand the attorney's fee award. We will do so. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *Roberson v. City of Austin*, 157 S.W.3d 130, 137 (Tex. App.—Austin 2005, pet. denied).[20] On remand, the district court should similarly revisit its permanent injunction to the extent this relief was predicated on its erroneous declaration that a negative implied restrictive covenant barred commercial use of the Point or Notch. *Coleman*, 514 S.W.2d at 903 (use incident

---

[20] Appellants also complain that the district court improperly awarded appellate attorney's fees to appellees conditioned on appellants' failure to be "successful in *completely* reversing this judgment." (Emphasis added.) The district court should also address this issue on remand.

58

to easement is limited to that "reasonably necessary and convenient and as little burdensome as possible to the servient owner"); *see also State v. Brownlow*, 319 S.W.3d 649, 656 (Tex. 2010) ("[T]he rights reasonably necessary for full enjoyment of an easement are limited. They do not encompass rights foreign to the purpose for which the easement is granted. The servient estate holder retains these rights."). We sustain appellants' seventh issue.

## CONCLUSION

Based on a prescription theory, we affirm the district court's judgment declaring that a positive easement permits appellees to use the Point and Notch for access to Lake Travis, to maintain boat docks and boats, and engage in various recreational activities there. However, we reverse its judgment that the properties are burdened by a negative implied restrictive covenant prohibiting commercial use and render judgment that they are not. We remand the parties' attorney's fee claims and appellees' claims for injunctive relief for reconsideration in light of our holdings.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed in part; Reversed and Remanded in part

Filed:   June 28, 2012



Johnston419

# Appendix A

Appendix B

Oak Hurst Road

Rabbit Run Circle

Dyer

Gibson

Offitt 3
(Johnston)

Ross
(Cay)

Frazer
(Cay)

Dolan
(Johnston)

Sassman
(Johnston)

Menn
(Johnston)

Offitt 1
(Johnston)

McClanahan
(Johnston)

Offitt 2
(Johnston)

Max Drive

Oak   Hurst   Road

Hurst View

Chipmonk Road

"Point"

"Notch"

Graveyard
Point Road

Lake Travis
(Colorado River)

North



EXHIBIT
"B"

1071

**Appendix C**